# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

FILED

2018 APR 17 P 1: 51

U.S. DISTRICT COURT
EASTERN DIST. TENN.

| | | |
|---|---|---|
| (UNDER SEAL), | ) | |
| | ) | |
| Plaintiffs/Relators, | ) | |
| | ) | Civil Action No. 3:18-cv-154 |
| v. | ) | Mattice / Poplin |
| | ) | |
| (UNDER SEAL), | ) | |
| | ) | |
| Defendants. | ) | |

---

## FALSE CLAIMS ACT COMPLAINT

---

**[FILED UNDER SEAL]**

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| **UNITED STATES OF AMERICA; and THE STATE OF TENNESSEE** | ) ) ) |
| *ex rel.* **Janelle Cox** | ) ) |
| **Plaintiffs/Relators,** | ) ) ) |
| **-v-** | ) ) |
| **Associated Pain Specialists P.C. and Smoky Mountain Ambulatory Surgery Center LLC** | ) ) ) ) |
| **Defendants.** | ) ) |

**FILED UNDER SEAL PURSUANT TO THE FALSE CLAIMS ACT, 31 U.S.C. § 3729,** *et seq.*

Case No. 3:18-cv-154

(Judge Mattice/Poplin )

**JURY DEMAND**

## FALSE CLAIMS ACT COMPLAINT

# I.   **INTRODUCTION**

This is an action by *qui tam* Relator Janelle Cox ("Relator" or "Ms. Cox"), through the undersigned counsel, made on behalf of the United States of America ("United States") and the State of Tennessee against Associated Pain Specialists P.C. and Smoky Mountain Ambulatory Surgery Center LLC also d/b/a Physicians Consulting and Tennessee Men's Health Clinic and formerly d/b/a MUA Medical Clinic of Knoxville, LLC, (collectively "APS" or "Defendants") for using, making, presenting, and causing to make, use, or present false statements and claims to the government in violation of the False Claims Act, 31 U.S.C. § 3729, *et seq.,* Tennessee Medicaid False Claims Act, TENN. CODE ANN. § 71-5-181, *et seq.,* and Tennessee False Claims Act, TENN. CODE ANN. § 4-18-101, *et seq.*

The fraud alleged herein is straightforward. Since at least 2015, APS has illegally, intentionally, and for financial gain been defrauding government healthcare programs such as Medicare by submitting, and causing others to submit, false claims for reimbursement. APS is a pain management facility with only two physicians and one to four nurse practitioners on staff (depending on the relevant time period). APS treats roughly 80-120 patients per day at each of its two locations. Relator estimates that nearly 90% of their patients are on government insurance.

APS purposely instructs its non-physician personnel to perform services – including prescribing dangerously addictive opioids – without any physician supervision. APS then submits claims to Medicare for reimbursement, falsely alleging that its signing physician ("Physician 1") performed or supervised the services. However, Physician 1 lives roughly 2000 miles away and is never present at APS. Defendant regularly puts Physician 1's signature on the same form for multiple patients (a fraudulent process commonly referred to as "cloning.") Relator estimates APS submits nearly 4,000 claims a month falsely alleging patient services are being performed and/or supervised by Physician 1 and, as a result, has wrongfully received and withheld millions of dollars

a year in Medicare reimbursement.

Defendant additionally instructs its personnel to order and perform medically unreasonable and unnecessary tests on all its patients, such as Vital System Assessment Test ("VSAT"), trigger points, braces, x-rays, injections and neural scans (referred to as "add-on" tests or services). APS instructs its mid-level providers to order VSATs on every patient by their third appointment. Defendant is aware that Medicare will only reimburse it for VSATs performed on patients diagnosed with a handful of ICD-9/10 codes, including idiopathic hereditary neuropathy ("IHN"), and therefore instructs its personnel to falsely code every patient as having IHN. APS then submits these claims to Medicare for reimbursement, falsely representing they were medically reasonable and necessary. Relator estimates that Defendant bills Medicare for roughly 150 VSATs a month and Medicare reimburses Defendant $500 per VSAT performed. As a result, Relator estimates Defendant has wrongly received approximately $1,000,000 a year in Medicare reimbursement since 2015.

Additionally, APS has purposely and routinely up-coded new and established patient office visits to the highest-severity ICD-9/10 code without any documentation of comprehensive history, comprehensive exam, or medical decision-making of high complexity (required to justify such a high code). APS then submits these false claims to Medicare for the purpose of receiving higher reimbursement amounts. Relator estimates that Defendant wrongfully received over $500,000 a year for falsely-coded new patient visits and over $3,000,000 a year for falsely-coded established patient visits.

As a result of these false claims, and upon information and belief, Relator estimates that since 2015, APS has wrongfully received millions of dollars from the government.

Under the terms of the False Claims Act, this Complaint is to be filed *in camera* and under

seal and is to remain under seal for a period of at least 60 days and shall not be served on Defendants until the Court so orders. The government may elect to intervene and proceed with the action within the 60-day time frame, or within any extensions of that initial sixty-day period granted by the Court for good cause shown, after it receives both the Complaint and the Material Evidence submitted to it.

For her causes of action, Ms. Cox alleges as follows:

## II.    NATURE OF THE ACTION

1.      This is an action to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-3733.

2.      Under the False Claims Act, a private person may bring an action in federal district court for herself and for the United States, and may share in any recovery. 31 U.S.C. § 3730(b). That private person is known as a "Relator" and the action that the Relator brings is called a *qui tam* action.

## III.   JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction to adjudicate this action under 28 U.S.C. §§ 1331 and 1345.

4.      This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants transact and have transacted business in this District.

5.      Venue is proper in this District under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b) and (c) because a substantial part of the events or omissions giving rise to the claims occurred in this District and Defendants transacted business in this District.

6.      In addition, to promote judicial efficiency, this Court may exercise supplemental jurisdiction over the Tennessee claims pursuant to 28 U.S.C. § 3732(b) and 28 U.S.C. § 1367(a),

in that all state created claims pleaded, or that may be pleaded in this case, arise out of a common nucleus of operative facts.

## IV.   **PARTIES**

7.     Ms. Cox brings this action on behalf of the United States, including its agency, the Department of Health and Human Services ("HHS"), its component, the Centers for Medicare & Medicaid Services ("CMS," formerly the Health Care Financing Administration ("HCFA")), and all other government healthcare programs, such as Amerigroup, TRICARE/CHAMPUS, Blue Cross/Blue Shield – CHIP, and Veterans Administration ("VA").

8.     Ms. Cox also brings this action on behalf of the State of Tennessee, including all state counterpart agencies to the federal agencies referenced above.  (For drafting convenience, all federal and state healthcare programs together, "Medicare").

9.     Ms. Cox also brings this action on behalf of herself, as permitted under the False Claims Act.  Ms. Cox is a citizen of the United States and a resident of the State of Tennessee. Ms. Cox previously worked at APS as a Coding Supervisor responsible for coding all daily charts and delegating coding responsibilities to other staff. Ms. Cox has direct and independent knowledge of the information on which the allegations in this Complaint are based.  Ms. Cox is the original source of these allegations, and has knowledge of the false claims and records that APS knowingly, falsely and fraudulently submitted to the government as alleged herein.

10.     Defendants Associated Pain Specialists P.C. and Smoky Mountain Ambulatory Surgery Center LLC also d/b/a Physicians Consulting and Tennessee Men's Health Clinic and formerly d/b/a MUA Medical Clinic of Knoxville, LLC are Tennessee corporations with its principal offices located in Tennessee. APS is located at 1326 Papermill Pointe Way, Knoxville, Tennessee 37909 and 818 Sunset Drive, Johnson City, Tennessee, 37604.  Smoky Mountain

Ambulatory Surgery Center, LLC is located at 1338 Papermill Pointe Way, Knoxville TN, 37909.

Tennessee Men's Health Clinic is located at 1328 Papermill Pointe Way, Knoxville, Tennessee, 37909.

## V.    LEGAL FRAMEWORK

### A.    The False Claims Act

11.    The False Claims Act ("FCA") provides, in pertinent part, that any person who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]
>
> . . .
>
> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, . . . plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a). The Affordable Care Act requires a person who has received an overpayment of Medicare or Medicaid to report and return the overpayment within 60 days of identification or the date any corresponding cost report is due, and failure to report and return the overpayment is an obligation for the purposes of the False Claims Act under 31 U.S.C. § 3729(a)(1)(G). *See* 42 U.S.C. § 1320a-7k(d).

12.    For purposes of the FCA:

> (1) the terms "knowing" and "knowingly"
>
> > (A) mean that a person, with respect to information – (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts

in reckless disregard of the truth or falsity of the information; and

(B) require no proof of specific intent to defraud.

31 U.S.C. § 3729(b). Effective November 2, 2015 (the date of enactment of the Federal Civil Penalties Inflation Adjustment Act, Improvements Act of 2015, Public Law 114-74, sec. 701 ("2015 Amendments")), the penalties increased from a minimum-maximum per-claim penalty of $5,500 and $11,000 to $10,781 and $21,563. The increased amounts apply to civil penalties assessed for violations occurring after November 2, 2015. Violations that occurred on or before November 2, 2015 are subject to the previous penalty amounts. On February 3, 2017, pursuant to the 2015 Amendments annual re-indexing of the FCA penalties for inflation, the civil penalties again increased to the current minimum-maximum per-claim penalty of $10,957 and $21,916. Effective February 9, 2018, the Bipartisan Budget Act of 2018 increased the maximum civil penalties for federal health care program fraud occurring after February 9, 2018.

B.   **The Medicare Program**

13.    The Health Insurance for the Aged and Disabled Program, popularly known as the Medicare program, was created in 1965 as part of the Social Security Act ("SSA") to pay the costs of certain healthcare services for eligible individuals. The Secretary of Health and Human Services ("HHS"), an agency of the United States whose activities, operations, and contracts are paid from federal funds, administers the Medicare program through the Health Care Financing Administration ("HCFA"), a component of HHS.

14.    Medicare is a 100% federally subsidized health insurance system for eligible Americans, including those aged 65 and older, certain disabled people, and certain people with chronic diseases who elect coverage. 42 U.S.C. § 1395c; *see* 42 U.S.C. §§ 1395j-1395w.

15.    Under the terms and policies of insurance, Medicare only provides benefits for

medically necessary services rendered by eligible and appropriately licensed providers. *See* 42 U.S.C. § 1395y(a)(1)(A). Medicare has no obligation to pay claims or provide benefits for unnecessary services.

16. To participate in Medicare, a provider must sign and file a Provider Agreement with CMS promising compliance with applicable statutes, regulations, and guidance. 42 U.S.C. § 1395cc; 42 C.F.R. § 412.23(e)(1). Medicare service providers have a legal duty to familiarize themselves with Medicare's reimbursement rules, including those delineated in the Medicare Manuals. *Heckler v. Cmty. Health Serv. of Crawford Co., Inc.,* 467 U.S. 51, 64–65 (1984).

17. Providers are typically compensated for the services they provide to Medicare beneficiaries on a "fee-for-service" basis as determined by Medicare's fee schedule. 42 U.S.C. § 1395w-4. To obtain compensation, providers must deliver a compensable service, certify that the service was medically necessary for the health of the patient, certify that the service was personally furnished by the physician (or under his or immediate supervision), and determine the appropriate diagnosis and procedure code to describe the problem and service for billing.

18. In order to bill Medicare, a provider must submit a form called the CMS 1500. The form describes, among other things, the provider, the patient, the referring physician, the services provided by procedure code, the related diagnosis code(s), the dates of service, and the amounts charged. The provider certifies on the CMS 1500 claim that the information provided is truthful and that the services billed on the form were "medically indicated and necessary."

19. Reimbursement for Medicare claims is made by the United States through HHS. CMS is an agency of HHS and is directly responsible for the administration of the Medicare program. CMS, in turn, contracts with private insurance carriers to administer and pay claims from the Medicare Trust Fund. *See* 42 U.S.C. § 1395u. Claims submitted for reimbursement are

to be paid in accordance with the Social Security Act, Code of Federal Regulations, and Medicare Rules and Regulations promulgated by CMS.

### C.  __The Medicaid Program__

20.     Medicaid is a joint federal-state program that pays for healthcare services for low-income individuals, including pregnant women, children, and parents and other caretaker relatives, as well as elderly and disabled individuals.  As a result of the Affordable Care Act, each state had the option to expand eligibility for Medicaid beginning in calendar year 2014 to all nonelderly adults with income below 138 percent of the federal poverty guidelines.

21.     Medicaid is jointly funded by state and federal governments.  The federal government's share of each state's Medicaid spending, known as the Federal Medical Assistance Percentage ("FMAP"), is based upon the state's per capita income compared to the national average. 42 U.S.C. § 1396d(b).  Such share must be at least 50 percent, but no more than 83 percent, and historically has averaged about 57 percent.  In other words, the federal government guarantees to match at least $1 in federal funds for every $1 any individual state spends on its Medicaid program.

22.     State Medicaid programs must comply with the minimum requirements set forth in the federal Medicaid statute to qualify for federal funding. 42 U.S.C. § 1396a.  In order to receive reimbursement from Medicaid, a provider must submit a signed claims form to the state's Medicaid program, certifying that the information on the form is "true, accurate, and complete." 42 C.F.R. § 455.18. The provider further certifies that it "understand[s] that payment of this claim will be from federal and state funds, and that any falsification, or concealment of a material fact, may be prosecuted under federal and state laws." *Id.*

23.     By participating in a state's Medicaid program, Defendants are charged with actual

notice and knowledge of the federal and state statutes, regulations, and rules applicable to the Medicaid program, and have consented to compliance with all such statutes, regulations, and rules, including those governing reimbursement.

### D.    <u>Medicare Coverage for Diagnostic Tests</u>

24.     Medicare pays for clinical diagnostic testing services only if such services are medically reasonable and necessary for the treatment or diagnosis of illness or injury of a Medicare program beneficiary. 42 U.S.C. 1395y(a)(1)(A). Medicare does not pay for diagnostic or laboratory services that were ordered for purposes of screening for possible conditions. Instead, signs or symptoms of illness or injury requiring diagnosis or treatment are required before Medicare reimburses for such services.

25.     The Secretary of HHS ("Secretary") is responsible for specifying services covered under the "reasonable and necessary" standard and has wide discretion in selecting the means for doing so. *See* 42 U.S.C. § 1395ff(a). Typically, the Secretary acts through formal regulations and sub regulatory guidance. Presently, the Secretary provides guidance to eligible providers pursuant to a series of manuals published by CMS. The manuals offer a definitive explanation of the Medicare regulatory regime and what providers must do to comply with it. *See* 42 U.S.C. § 1395ff(a) (giving the Secretary authority to promulgate these guidelines).

26.     All diagnostic tests must be ordered by the physician treating the patient for the treatment of specific illness or injury. 42 C.F.R. § 410.32(a). Tests not ordered by the physician who is treating the beneficiary are not medically reasonable and necessary. To assess whether those services are medically reasonable and necessary and whether reimbursement is appropriate, Medicare requires documentation of the services rendered to beneficiaries. Medicare regulations expressly state that a claim for services will be denied if there is not sufficient documentation in

the patient's medical record to establish that the service was medically reasonable and necessary. *E.g.*, 42 C.F.R. § 410.32(d)(3).

27.     The HHS-OIG guidance clarifies that standing orders are discouraged and that Medicare does not pay for tests not meeting Medicare's coverage requirements:

> Therefore, Medicare may deny payment for a test that the physician believes is appropriate, but which does not meet the Medicare coverage criteria (e.g., done for screening purposes) or where documentation in the entire patient record, including that maintained in the physician's records, does not support that the tests were reasonable and necessary for a given patient.
>
> . . . .

63 Fed. Reg. 45076, 45079–81 (Aug. 24, 1998), *available at* https://oig.hhs.gov/authorities/docscp glab.pdf (emphasis added).

**E.     Physician Supervision and Reimbursement for Non-Physician Services**

28.     Healthcare providers may bill Medicare Part B for the services of physician assistants and nurse practitioners in one of two ways; the amount of reimbursement the providers receive is dependent on the billing method.

29.     Physician assistant or nurse practitioner services may be billed as services "incident to the service of a physician." 42 CFR §§ 410.10, 410.26.

30.     Alternatively, a provider may bill Medicare for physician assistant and nurse practitioner services under the physician assistant's or nurse practitioner's own UPIN. For services billed under a physician assistant's or nurse practitioner's UPIN, the institution pays 85% of what it would pay for the same services billed under a physician's UPIN.

31.     "Medicare claims may be false if they claim reimbursement for services or costs that either are not reimbursable or were not rendered as claimed." *United States ex rel. Walker v. R & F Props. of Lake Cty., Inc.*, 433 F.3d 1349, 1356 (11th Cir. 2005).

## VI. FACTUAL ALLEGATIONS

32. Relator Ms. Cox began working for APS as a coder in 2017. Prior to her employment with APS, Ms. Cox worked in the health care industry for 17 years and as a coder for 6 years.

33. When Relator began working at APS, Relator learned that APS had been defrauding Medicare by submitting, and causing others to submit, false and fraudulent claims for health services in violations of the False Claims Act.

34. Defendant APS is a pain management facility primarily located in Knoxville Tennessee, with an additional office location in Johnson City, Tennessee. APS's website describes its focus as "chronic pain." Upon information and belief, APS also owns and operates Tennessee Men's Health Clinic. Defendant Smoky Mountain is an intertwined but separate entity from APS. Smoky Mountain previously operated under the name "MUA Medical Clinic of Knoxville, LLC," but, upon information and belief, lost CMS certification in 2013 and reopened under its current name.

35. From at least 2015-2017, Defendant has been illegally earning revenue by fraudulently billing Medicare for services performed by mid-level providers as if they were performed or supervised by its signing physician. Further, Defendant instructed and coerced their personnel to regularly order medically unreasonable and unnecessary tests, including VSATS, neural scans, braces, and xrays. Additionally, Defendant falsely coded all new and established patient office visits at the level 5 ICD-9/10 code (the most severe code available for office visits) in order to increase its Medicare reimbursement.

## APS SUBMITTED FALSE CLAIMS FOR PHYSICIAN SERVICES TO MEDICARE

36. Rather than hiring credentialed physicians, upon information and belief, APS

purposely hired and instructed lower-paid Nurse Practitioners and Physician Assistants (collectively referred to as "mid-level providers") and other staff members to perform its patients services; including examining its patients, writing pain medication prescriptions including highly addictive opioids, and ordering and performing tests. Then, it employed a "signing" physician (Physician 1) to sign forms and Medicare claims, falsely alleging that Physician 1 performed or supervised the services himself. Defendant expedited this process by improperly using scribes and electronic signatures to "rubber stamp" forms without Physician 1 even having to look at the document.

37.     Although Medicare will reimburse services performed by mid-level providers, healthcare providers may only legally bill Medicare for mid-level provider services in one of two ways; as services "incident to the service of a physician," 42 CFR §§ 410.10, 410.26, or under the physician assistant/nurse practitioner's own UPIN number at 85% reimbursement and the physician is present or immediately available for consultation.

38.     Upon information and belief, APS submits nearly 4,000 claims a month falsely alleging patient services are being performed and/or supervised by Physician 1. In reality, Physician 1 lives in Las Vegas, Nevada, roughly 2000 miles away from APS. In Relator's entire time employed at APS, Physician 1 was only physically present at APS *once*.

39.     One particularly fraudulent example was APS's method of billing neural scans (nerve conductive studies, coded as 95912 & 95913). APS regularly billed Medicare for neural scans Physician 1 allegedly ordered and performed, when in reality, Physician 1 was never present or otherwise involved in the patient's treatment.

40.     Physician 1 never reviewed the neural scan test results. In fact, the neural scan report summaries were *the same* for every patient. This process (commonly referred to as

"cloning")[1] enabled APS to submit fraudulent claims to Medicare for reimbursement.

41.     Relator estimates the Johnson city location submits roughly 40 false claims for neural scans a month at $700 reimbursement, totaling over $300,000 dollars in wrongfully received reimbursement a year.

42.     Additionally, non-credentialed mid-level providers at the Johnson City location would regularly prescribe patients pain medications, and Physician 1 would "rubber stamp" the claims, falsely alleging he had examined the patient and prescribed the medication himself.

43.     APS also utilized this "rubber stamping" method to allege its mid-level providers had seen patients and performed services that they did not (and often could not have) perform.

44.     For example, In November 2017, one of APS's owners ("Owner 1") told Relator to complete all charts for a nurse practitioner ("NP 1"), who worked in the Johnson City office, by Friday, November 3 because NP 1 had to undergo a C-section on Monday, November 6 and would be out of the office for an extended period of time.

45.     However, on Wednesday, November 8, Relator and a fellow coder reviewed charts that indicated NP 1 had seen over 50 patients on Monday, November 7 and Tuesday, November 8. Relator conveyed these concerns to Owner 1 who confirmed that, although NP 1 was in fact out of the office those days, Relator should not "put too much pressure" on the situation because the Johnson City office was only down to one provider (who, upon information and belief, was *not* credentialed by Medicare).

46.     As a result, Relator estimates that Defendant submits over 50,000 false claims a

---

[1] "Copy-pasting, also known as cloning, allows users to select information from one source and replicate it in another location. When doctors, nurses, or other clinicians copy-paste information but fail to update it or ensure accuracy, inaccurate information may enter the patient's medical record and inappropriate charges may be billed to patients and third-party health care payers. Furthermore, inappropriate copy-pasting could facilitate attempts to inflate claims and duplicate or create fraudulent claims." AACP, *Cloning: Address the Elephant in the Room,* March 1, 2015, available at https://www.aapc.com/blog/29747-cloning-address-the-elephant-in-the-room/

year falsely alleging services are being performed or supervised, resulting in millions of dollars of reimbursement which has been wrongfully received and withheld by Defendant.

## APS SUBMITTED FALSE CLAIMS FOR MEDICALLY UNREASONABLE AND UNNECESSARY TESTS TO MEDICARE

47.     In addition, since at least 2015, APS has illegally, intentionally, and for financial gain encouraged and often coerced its mid-level providers to order and run medically unreasonable and unnecessary tests on all of its patients. These tests included Vital System Assessment Tests ("VSAT"), injections, trigger points, braces, xrays, and neural scans.

48.     One of the most egregious example is Defendants procedures for ordering and billing VSATs. VSATs are a series of tests that measure a patient's heart rate variability, pulsewave velocity, and sudomotor function. VSATs are advertised online to hospitals and other health care providers by a number of third-party companies ("VSAT companies") with a primary purpose of generating income.[2] Upon information and belief, APS entered into an agreement with a VSAT company, VSAT Diagnostics. Because of this agreement, Relator estimates that APS was receiving $500 for every VSAT test performed.

49.     APS explicitly instructed its mid-level providers to order a VSAT for *every patient* by their third appointment at the latest. Mid-level providers therefore had a standing order to run VSATs without any physician supervision and without any documentation in the record explaining why the tests were medically reasonable or necessary.

50.     Further, APS instructed it's personnel to falsely code *every* patient as having

---

[2] Many VSAT companies boast that providers will generate thousands of additional dollars per month in Medicare reimbursement revenue by performing VSATs. *See, e.g.,* Biocom, available at https://www.biocomgroup.com/vsat (last accessed 1/25/2018); Bundle Vital Systems, available at https://www.vsbundle.com/reimbursement (last accessed Jan 25, 2018). However, the alleged medical purpose of VSATs is to "quantify" a patient's risk for heart attack and stroke. *See* VSAT Diagnostics, available at https://vsdiagnostics.com/ (last accessed Jan. 25, 2018).

idiopathic hereditary neuropathy[3] ("IHN") to receive Medicare reimbursement for VSATs.

51.     Medicare will only reimburse providers for VSATs if they are ordered for patients diagnosed with a handful of specific ICD-9/10 codes. Upon information and belief, VSAT Diagnostics (through trial and error) determined which ICD 9/10 codes Medicare would reimburse VSATs for and which they would not. Because of this, APS followed a "VSAT Cheat Sheet" on how to code VSATs to ensure reimbursement. (A copy of the full VSAT Cheat Sheet is attached hereto as Exhibit A).

| (1B) PATIENT ANSWERS "YES", OK TO BILL FOR PULSEWAVE, ECG, SUDOMOTOR & HRV (93923 X2, 93040, 95923, & 95924) | | | | | |
|---|---|---|---|---|---|
| PWV | SUDO/HRV | | PWV | SUDO/HRV | |
| R09.89 | G90.09 | Peripheral Neuropathy ( a result of damage to your peripheral nerves, often causes weakness, numbness and pain, usually in your hands and feet. It can also affect other areas of your body)? | G60.9 | | Idiopathic Peripheral Neuropathy? Neuropathy is when nerve damage interferes with the functioning of the peripheral nervous system (PNS). When the cause can't be determined, it's called idiopathic neuropathy. Includes numbness, tingling and pain in legs and/or feet. |
| R09.89 | G23.8 | Degenerative Disease (as arteriosclerosis, diabetes mellitus, or osteoarthritis) characterized by progressive degenerative changes in tissue)? | | | |
| R09.89 | E10.40 | Diabetes Type I with neurological symptoms? | R09.89 | G90.519 | Reflex Sympathetic Dystrophy (marked by burning pain, swelling, and motor and sensory disturbances especially of an extremity after an injury)? |
| R09.89 | E11.40 | Diabetes Type II with neurological symptoms? | | | |
| R09.89 | R00.0 | Do you ever experience a rapid heart rate (Tachycardia)? | R09.89 | G90.519 | Reflex Dystrophy (Chronic Pain in Limbs after injury, stroke or heart attack)? |
| G60.9 | | Do you ever notice a tingling/numbness feeling in your fingers, arms, legs or feet? | R55 | | Do you ever stand up and get dizzy and/or light headed? |
| R09.89 | I95.1 | Do you have hypotension (very low blood pressure)? | M79.89 | G60.9 | Edema (swelling in arms and/or legs)? |
| G60.9 | | Do you ever have pain in your arms and/or legs? | R61 | | Do you experience hyperhidrosis (Excessive sweating)? |

52.     As indicated, Medicare will reimburse for VSATs performed on patients diagnosed with IHN (coded as G60.9). Therefore, APS instructed its personnel to code every patient as having IHN, even when their symptoms were associated with a completely different diagnosis or their charts directly contradicted a diagnosis of IHN.

53.     APS had one of its staff technicians perform the VSATs without any knowledge or training on how to use the VSAT equipment. Upon information and belief, APS never reviewed or utilized the VSAT test results for any of its patients.

---

[3] Neuropathy occurs when nerve damage interferes with the functioning of the peripheral nervous system. When the cause can't be determined, it's called idiopathic neuropathy. Health line, available at https://www.healthline.com/health/idiopathic-neuropathy (last accessed Jan. 25, 2018).

54.     In fact, Relator estimates for at least the first ten (10) months that APS was performing VSATs (January 2017 to November 2017), the test results from the VSATs were illegible and blatantly incorrect due to malfunctioning equipment and untrained operators. The results were so problematic Relator eventually called VSAT Diagnostics to train the technician and replace the VSAT equipment. In other words, in *6 months* Defendant failed to look at a single VSAT result significantly enough to realize there was a problem.

55.     However, APS continued, and upon information and belief, still continues to submit these false claims to Medicare for reimbursement.

56.     Relator estimates that between APS's two office sites, APS performed, and upon information and belief continues to perform, roughly 150 VSATs per month.  Relator estimates that Medicare reimburses APS $500 per VSAT performed. As a result, Relator estimates APS has wrongly received over $1,000,000 a year in Medicare reimbursement since 2015.

## APS SUBMITTED FALSELY UPCODED CLAIMS FOR NEW AND ESTABLISHED PATIENT OFFICE VISIT TO MEDICARE

57.     Additionally, from at least 2015 through 2017, APS illegally, purposely, and for financial gain falsely up-coded all of their new and established patient office visits at the highest level ICD-9/10 code of office-visit severity to increase its Medicare reimbursement.

58.     According to ICD-9/10 guidelines, patient office visits should be coded from level 1-5 based on the severity; 99211 (least severe) to 99215(most severe) for established patients and 99201(least severe) to 99205(most severe) for new patient office visits.

59.     Documentation in the clinical record must support the level of service coded and billed. The three key components in determining the appropriate code to be assigned for a given office visit are: patient history, physical examination, and level of medical decision making. The amount of time the office visit took is also a good indicator of the appropriate severity level.

Complaint

60.     The general guidelines for properly coding the level of established patient office visits (two of three required) are[4]:

| Level | Code | History | Physical Exam | Medical decision making | Time |
|---|---|---|---|---|---|
| 1 | 99211 | None | None | None | 5 |
| 2 | 99212 | Problem Focused | Problem Focused | Straightforward | 10 |
| 3 | 99213 | Expanded Problem Focused | Expanded Problem Focused | Low | 15 |
| 4 | 99214 | Detailed | Detailed | Moderate | 25 |
| 5 | 99215 | Comprehensive | Comprehensive | High | 40 |

61.     The general guidelines for properly coding the level of new patient office visits (three of three required) are:

| Level | Code | History | Physical Exam | Medical decision making | Time |
|---|---|---|---|---|---|
| 1 | 99201 | Problem Focused | Problem Focused | Straightforward | 10 |
| 2 | 99202 | Expanded Problem Focused | Expanded Problem Focused | Straightforward | 20 |
| 3 | 99203 | Detailed | Detailed | Low | 30 |
| 4 | 99204 | Comprehensive | Comprehensive | Moderate | 45 |
| 5 | 99205 | Comprehensive | Comprehensive | High | 60 |

62.     Medicare will reimburse a provider a higher sum of money corresponding to a higher level office-visit code. For example, the non-facility 2017 Medicare allowable reimbursement for the highest level of severity (99205) was $209.23 compared to $44.50 for the

---

[4] *See* EM University, New Office Patients 99201-99205, available at    (last accessed 1/24/2018); https://www.myoptumhealthphysicalhealth.com/Documents/Reimbursement%20Policies/E_M%20QuickReference Table.pdf (last accessed 1/24/2018);

lowest level (99201) office visits.[5] Because of this, APS has intentionally and falsely coded all patient office-visits at the highest severity of codes (99205 for new patients and 99215 for established patients).

a. *New Patients*

63. 99205 is a code that should be "reserved for the sickest of patients." As indicated in the chart above, to report 99205 appropriately, the service must call for a documented (1) medically necessary comprehensive history; (2) medically comprehensive exam, and (3) medical decision-making of high complexity. "High complexity" means that risk of morbidity without treatment is high to extreme, or a high probability of severe functional impairment. "To put it another way: The next step for the patient would be the emergency room (and perhaps a hospital admission)."[6]

64. Yet, Defendant routinely and systematically coded all their new patient office visits at 99205, even though there was very seldom documentation of comprehensive history, comprehensive exam, or medical decision-making of high complexity. To justify the highest-level codes, APS instructed every new patient be falsely coded as having at least three separate diagnoses codes, even if there was nothing in the patient notes or charts to substantiate them. Every new patient was automatically coded with having chronic pain (G89.2) during their first office visit to ensure APS would get reimbursed by insurance for the patient's treatment plan, whether or not the diagnosis was supported.

65. Relator estimates that APS falsely coded roughly 240 new patient office visits a month at 99205. Medicare reimburses roughly $209.23 for an office visit coded as 99205. As a

---

[5] Centers for Medicare and Medicaid Services, *Physician Fee Schedule Search,* available at https://www.cms.gov/apps/physician-fee-schedule/search/search-results.aspx?Y=1&T=0&HT=0&CT=0&H1=99201&M=1 (last accessed Jan. 25, 2018).
[6] EM University, *supra* note 4.

result, Relator estimates APS wrongfully received over $500,000 a year in reimbursement.

b. **_Established Patients_**

66.     Similarly, APS routinely and systematically coded all their established patient office visits at the highest level of severity (99215) even though there was very seldom any documentation of comprehensive history, comprehensive exam, or medical decision-making of high complexity.

67.     Relator regularly reviewed charts where a patient came in for a routine check-up to refill their pain medications. These patient office visits were done by mid-level providers and upon information and belief would often last only 10-15 minutes. However, despite the simplicity and straightforward medical decision making, APS fraudulently coded the visit at the highest level of severity (99215) to increase its Medicare reimbursement amount.

68.     Relator estimates that APS falsely coded 80 patients a day or roughly 1600 patients a month at 99215. Medicare reimburses roughly $150[7] for an office visit coded as 99215. As a result, Relator estimates APS wrongfully received nearly $3,000,000 a year in reimbursement.

*        *        *

69.     In sum, APS defrauded the government by submitting false claims and claims for medically unreasonable and unnecessary tests for reimbursement by Medicare. By submitting Medicare claims, APS misrepresented that it was in compliance with all relevant statutory, regulatory, and contractual requirements.   APS's misrepresentations were material to the government's payment decision – *i.e.*, had the government known that the claims were false, the government would not have paid APS for its claims.

---

[7] *Centers for Medicare and Medicaid Services, Physician Fee Schedule Search, supra* note 5.

70. Based on the foregoing, Ms. Cox estimates that since 2015, APS has defrauded the government for millions of dollars in false claims. The fraud continues today.

## COUNT I
## VIOLATION OF THE FALSE CLAIMS ACT
## 31 U.S.C. § 3729(a)(1)(A)

71. Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

72. As set forth above, from at least 2015 through the present, Defendants presented false or fraudulent claims for payment, or knowingly caused false or fraudulent claims for payment to be presented, to officials of the United States government in violation of 31 U.S.C. § 3729(a)(1)(A).

73. The government paid APS for its false or fraudulent claims, and APS's misrepresentations were material to the government's payment decision. Had the government known APS's claims were false, the government would not have paid APS for its claims.

74. By virtue of the false or fraudulent claims submitted or caused to be submitted by Defendants, the United States suffered actual damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT II
## VIOLATION OF THE FALSE CLAIMS ACT
## 31 U.S.C. § 3729(a)(1)(B)

75. Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

76. As set forth above, from at least 2015 through the present, Defendants knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent

Complaint
22

claims in violation of 31 U.S.C. § 3729(a)(1)(B).

77.    The government paid APS for its false or fraudulent claims, and APS's misrepresentations were material to the government's payment decision. Had the government known APS's claims were false, the government would not have paid APS for its claims.

78.    By virtue of the false or fraudulent claims submitted or caused to be submitted by Defendants, the United States suffered actual damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

**COUNT III**
**VIOLATION OF THE FALSE CLAIMS ACT**
**31 U.S.C. § 3729(a)(1)(G)**

79.    Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

80.    As set forth above, from at least 2015 through the present, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the government pursuant to 31 U.S.C. § 3729(a)(1)(G).

81.    The government paid APS for its false or fraudulent claims, and APS's misrepresentations were material to the government's payment decision. Had the government known APS's claims were false, the government would not have paid APS for its claims.

82.    As set forth above, APS wrongfully received overpayment from Medicare for millions of dollars and purposely withheld it knowing it was wrongly received. The Affordable Care Act requires a person who has received an overpayment of Medicare or Medicaid to report and return the overpayment within 60 days of identification or the date any corresponding cost

Complaint
23

report is due, and failure to report and return the overpayment is an obligation for the purposes of the False Claims Act under 31 U.S.C. § 3729(a)(1)(G). *See* 42 U.S.C. § 1320a-7k(d).

83.     By virtue of the false or fraudulent claims submitted or caused to be submitted by Defendants, the United States suffered actual damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT IV
### VIOLATION OF THE TENNESSEE MEDICAID FALSE CLAIMS ACT
### TENN. CODE ANN. § 71-5-182(a)(1)

84.     Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

85.     This is a claim for penalties and treble damages under the Tennessee False Claims Act.

86.     As set forth above, from at least 2015 through the present, Defendants knowingly presented or caused to be presented to the State of Tennessee false or fraudulent claims for payment or approval under the Medicaid program in violation of Tenn. Code Ann. § 71-5-182.

87.     The State of Tennessee paid APS for its false or fraudulent claims, and APS's misrepresentations were material to the government's payment decision. Had the State of Tennessee known APS's claims were false, the State of Tennessee would not have paid APS for its Medicaid claims.

88.     By virtue of the false or fraudulent claims submitted or caused to be submitted by Defendants, the State of Tennessee suffered actual damages and therefore is entitled to multiple damages under the Tennessee Medicaid False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT V

Complaint
24

## VIOLATION OF THE TENNESSEE FALSE CLAIMS ACT
### TENN. CODE ANN. § 4-18-103(A)(1)

89.     Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

90.     This is a claim for penalties and treble damages under the Tennessee False Claims Act.

91.     As set forth above, from at least 2015 through the present, Defendants knowingly presented or caused to be presented to the State of Tennessee false or fraudulent claims for payment or approval in violation of Tenn. Code Ann. § 14-18-103(a)(1).

92.     The State of Tennessee paid APS for its false or fraudulent claims, and APS's misrepresentations were material to the government's payment decision. Had the State of Tennessee known APS's claims were false, the State of Tennessee would not have paid APS for its claims.

93.     By virtue of the false or fraudulent claims submitted or caused to be submitted by Defendants, the State of Tennessee suffered actual damages and therefore is entitled to multiple damages under the Tennessee False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT VI
## VIOLATION OF THE TENNESSEE FALSE CLAIMS ACT
### TENN. CODE ANN. § 4-18-103(A)(2)

94.     Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

95.     This is a claim for penalties and treble damages under the Tennessee False Claims Act.

96.     As set forth above, from at least 2015 through the present, Defendants knowingly

made, used, or caused to be made or used false records or statements material to a false or fraudulent claim submitted to the State of Tennessee in violation of Tenn. Code Ann. § 14-18-103(a)(2).

97.     The State of Tennessee paid APS for its false or fraudulent claims, and APS's misrepresentations were material to the government's payment decision. Had the State of Tennessee known APS's claims were false, the State of Tennessee would not have paid APS for its claims.

98.     By virtue of the false or fraudulent claims submitted or caused to be submitted by Defendants, the State of Tennessee suffered actual damages and therefore is entitled to multiple damages under the Tennessee False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## PRAYER FOR RELIEF

WHEREFORE, the United States and Relator demand that judgment be entered against Defendants and in favor of the Relator and the United States as follows:

On Count I through Count VI under the federal False Claims Act (and amended and equivalent state statutes), for the amount of the United States and State of Tennessee's damages, multiplied by three as required by law, and such civil penalties as are permitted or required by law; the maximum share amount allowed pursuant to 31 U.S.C. § 3730(d) and applicable state laws; all costs and expenses of this action, including attorney fees, expenses and costs as permitted by 31 U.S.C. § 3730(d) and applicable state laws; and all such other relief as may be just and proper.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Respectfully submitted,

/s/ D. Alexander Burkhalter, III
David A. Burkhalter II, BPR #004771
D. Alexander Burkhalter III, BPR #033642
THE BURKHALTER LAW FIRM, P.C.
P.O. Box 2777
Knoxville, Tennessee 37901
Phone: (865) 524-4974
Fax: (865) 524-0172
david@burkhalterlaw.com
alex@burkhalterlaw.com


/s/ Gregory M. Utter
Gregory M. Utter*
Joseph M. Callow, Jr.*
KEATING MUETHING & KLEKAMP PLL
One East Fourth Street
Suite 1400
Cincinnati, Ohio 45202
Phone: (513) 579-6400
Fax: (513) 579-6457
gmutter@kmklaw.com
jcallow@kmklaw.com

/s/ Joel. D. Hesch
Joel D. Hesch*
THE HESCH LAW FIRM, LLC
3450 Ridgecroft Dr.
Lynchburg, Virginia 24503
Phone: (434) 592-4251
Fax: (434) 582-7903
joel@howtoreportfraud.com

*Pro hac vice applications forthcoming*
*Attorneys for Relator, Janelle Cox*

Complaint
27

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing document was served via Certified Mail, Return Receipt requested, by placing same in the United States mail this the <u>17th</u> day of April, 2018, with proper postage affixed thereto, addressed to the following:

Jefferson Beauregard Sessions, III
United States Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001
**Attn:  United States False Claims Act filing**

Nancy Stallard Harr
United States Attorney for the Eastern District of Tennessee
800 Market Street, Suite 211
Knoxville, TN 37902
**Attn:  United States False Claims Act filing**
and

Herbert H. Slatery, III
State Attorney General
P.O. Box 20207
Nashville, TN 37202-0207
**Attn: Tennessee Medicaid/Tenncare False Claims Act**


<u>/s/ D. Alexander Burkhalter, III</u>
D. Alexander Burkhalter, III

Complaint
28