UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and<br>STATE OF TENNESSEE<br>*ex rel.* JANELLE COX,<br><br>    Plaintiffs,<br><br>    v.<br><br>ASSOCIATED PAIN SPECIALISTS, P.C.,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 3:18-cv-00154<br>MATTICE/POPLIN<br><br>JURY TRIAL DEMANDED |

# UNITED STATES' COMPLAINT IN INTERVENTION

The United States of America ("United States" or "Plaintiff"), by and through J. Douglas Overbey, United States Attorney for the Eastern District of Tennessee, files this Complaint in Intervention against Defendant Associated Pain Specialists, P.C. ("Defendant"). The United States alleges as follows:

## NATURE OF THE ACTION

1. The United States brings this action under the False Claims Act, 31 U.S.C. §§ 3729-3733 ("FCA"), to recover losses sustained by the Medicare and Medicaid Programs. The United States also brings this action to recover damages and other monetary relief under the common law or equitable theories of payment under mistake of fact, unjust enrichment and conversion.

2. Medicare is a federally-funded healthcare program, entitlement to which is based on age, disability, or affliction with end-stage renal disease. 42 U.S.C. §§ 426, 426-1.

3. Medicaid is a federal healthcare program that authorizes federal grants to states for Medicaid programs to provide medical assistance to persons with limited income and resources. 42 U.S.C. §1396 *et seq.* Medicaid programs are jointly financed by the federal and state governments, and are administered by the states in accordance with federal statutes and regulations pursuant to state plans, which must be approved by the Secretary of the Department of Health and Human Services. 42 C.F.R. § 430.0. In Tennessee, the state Medicaid program is commonly known as TennCare.

4. Among other things, Medicare and Medicaid pay for doctor visits and medically necessary diagnostic tests and preventive services.

5. Defendant is a local healthcare provider that focuses on interventional pain management.

6. From 2016 through 2018, Defendant performed tests known as Vital Signs Assessment Tests ("VSAT") and submitted claims for payment to Medicare and Medicaid/TennCare for performing VSATs on various Medicare and TennCare beneficiaries.

7. The VSATs consist of three distinct tests: pulse wave velocity (arterial elasticity), heart rate variability, and sudomotor function.

8. Pulse wave velocity measures the speed at which the heartbeat's wave of pressure passes through the arteries.

9. Heart rate variability measures changes in time between heartbeats.

10. Sudomotor function measures the movement of sweat. It assesses the skin's sympathetic activity by measuring the change in electrical potential of the skin due to a small amount of sweat production.

2

11. Heart rate variability and sudomotor function are indicators of the autonomic nervous system ("ANS"), while pulse wave velocity is an indicator for adverse cardiovascular events.

12. Medicare covers only reasonable and necessary medical services. 42 U.S.C. § 1395y(a)(1)(A); *see also* 42 U.S.C. § 1320c-5(a)(1)-(2) (providers have a duty to provide services only when they are medically necessary and meet professionally recognized standards of health care).

13. Defendant's claims for payment for VSAT testing were false and fraudulent because the tests were medically unnecessary, or experimental, resulting in hundreds of thousands of dollars of reimbursement which Defendant would not have been paid had it not been for Defendant's fraudulent claims.

14. Defendant knew, was deliberately ignorant or recklessly disregarded that the VSATs were medically unnecessary, or experimental, yet Defendant submitted claims for payment to Medicare and TennCare nonetheless.

## JURISDICTION

15. This Court has subject matter jurisdiction to entertain this FCA action under 31 U.S.C. § 3730(a) and 28 U.S.C. §§ 1331 and 1345, and supplemental jurisdiction to entertain common law or equitable claims under 28 U.S.C. § 1367(a).

16. This Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a), because Defendant resides in, and/or transacts and has transacted business in this District, and because Defendant committed acts within this District that violated 31 U.S.C. § 3729.

3

## VENUE

17. Venue is proper in the Eastern District of Tennessee pursuant to 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b) and (c) because Defendant resides and/or transacts business in this District, and because Defendant committed acts within this District that violated 31 U.S.C. § 3729.

## PARTIES

18. The United States brings this action on behalf of the Department of Health and Human Services ("HHS") and the Centers for Medicare and Medicaid Services ("CMS"), which administers the Medicare program, as well as the federal aspects of Medicaid.

19. Defendant is a business who operates its principal office in Knoxville, Tennessee.

## THE FALSE CLAIMS ACT

20. The FCA provides for the award of treble damages and civil penalties for, inter alia, knowingly submitting, or causing the submission of, false or fraudulent claims for payment to the United States government, or for knowingly making, using, or causing to be made or used, a false record or statement material to a fraudulent claim. 31 U.S.C. § 3729(a)(1).

21. The FCA defines the terms "knowing" and "knowingly" to mean that a person, with respect to information: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1)(A)(i-iii). The FCA does not require proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1)(B).

## MEDICARE

22. In 1965, Congress enacted Title XVIII of the Social Security Act establishing the Medicare program to pay for the costs of certain healthcare services. *See* 42 U.S.C. §§ 1395 -

1395gg. A person's entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 426, 426-1.

23. While the Medicare program has several parts (*see* 42 U.S.C. §§ 1395C-1395I), the allegations herein concern claims submitted by Defendants under Medicare Part B ("Supplementary Medical Insurance for the Aged and Disabled"), which covers, among other services, diagnostic tests for symptoms or signs of illness or injury. *See* 42 U.S.C. § 1395k; 42 C.F.R. §§ 410.10, 410.12, 410.32, 411.15, 424.10.

24. The Secretary of HHS (the "Secretary") has oversight authority for the Medicare Program and administers the program through its agency, CMS. CMS, in turn, contracts with private insurance carriers to administer and pay claims from the Medicare Trust Fund. *See* 42 U.S.C. § 1395u. Claims submitted for reimbursement are to be paid in accordance with the Social Security Act, Code of Federal Regulations, and Medicare Rules and Regulations promulgated by CMS.

25. Since November 2006, Medicare Administrative Contractors ("MACs") have generally acted on behalf of CMS to process and pay Part B claims and perform administrative functions on a regional level. *See* 42 U.S.C. § 1395kk-1; 42 C.F.R. § 421.400, et seq.; 71 F.R. 67960-01, at 68181 (Nov. 24, 2006).

26. The Part B MAC for the region that encompassed Tennessee between 2016 and 2018 was Cahaba Government Benefit Administrators, LLC ("Cahaba"). Beginning in February 2018, the Part B MAC contract was awarded to Palmetto GBA, LLC.

27. In order to participate in the Medicare program, a provider must submit a Medicare Enrollment Application, CMS-855I promising to comply with applicable statutes, regulations and guidelines, in order to be reimbursed by Medicare.

28. CMS-855I requires that the signatory certify as follows:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization listed in Section 4A of this application…. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.
>
> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

29. Additionally, an authorized official must sign the "Certification Section" in Section 15 of Form CMS-855I, which obligates the provider to comply with all applicable laws, regulations, and program instructions of the Medicare program.

30. Defendant signed a certification statement in Section 15 of CMS-855I indicating that it understood that it was required to comply with all Medicare laws, regulations, and program instructions.

31. Defendant also agreed to learn and adhere to Medicare and other federal healthcare program laws, regulations, and program instructions. Medicare service providers have a duty to familiarize themselves with Medicare's reimbursement rules, including those set forth in the Medicare Manuals.

32. Because it is not feasible for Medicare personnel to review every patient's medical records for the millions of claims for payments they receive from providers, the program relies on providers to comply with Medicare requirements and trusts providers to submit truthful and accurate certifications and claims.

6

## COVERAGE FOR DIAGNOSTIC TESTS

33. Medicare covers only reasonable and necessary medical services. 42 U.S.C. § 1395y(a)(1)(A); *see also* 42 U.S.C. § 1320c-5(a)(1)-(2) (providers have a duty to provide services only when they are medically necessary and meet professionally recognized standards of healthcare). Medicare laws specifically exclude from payment services that are not medically reasonable and necessary. 42 U.S.C. § 1395y(a)(1)(A).

34. TennCare laws contain similar provisions regarding medical necessity and reasonableness. *See* Tenn. Code Ann. § 71-5-144.

35. The Secretary is responsible for specifying services covered under the "reasonable and necessary" standard. *See* 42 U.S.C. § 1395ff(a).

36. The Secretary provides guidance to eligible providers pursuant to a series of manuals published by CMS. CMS Medicare Program Integrity Manual, Chapter 3, Section 3.6.2.2, states that items are "reasonable and necessary" and thus covered by Medicare if they are "not experimental or investigational."

37. The Secretary issues national coverage determinations that specify whether certain items, services, procedures, or technologies are reasonable, necessary, and covered under 42 U.S.C. § 1395ff(f)(1)(B). MACs, in turn, make local coverage determinations ("LCDs"). LCDs establish whether or not a particular item or service is covered on an intermediary or carrier-wide basis, in accordance with section 1395y(a)(1)(A). 42 U.S.C. § 1395ff(f)(2)(B).

38. Cahaba, the MAC for Tennessee at the time, issued an LCD that applies to ANS testing portion of the VSAT, which was in effect when Defendant began using the VSAT on its patients.

7

39. One potentially appropriate use for ANS testing is to diagnose or monitor rare autonomic nervous system conditions, but only after clinical examination, conventional tests, and treatments have ruled out more common conditions.

40. The LCD specifically states that ANS testing is not medically reasonable and necessary when other causes of symptoms have not been excluded; when such testing is not used in clinical decision-making and patient management; and when such testing is performed by physicians who do not have knowledge, training and expertise to perform and interpret the tests. *See* LCD 34500 – Medicine: Autonomic Function Tests (eff. 10/1/2015).

41. Furthermore, Medicare does not pay for diagnostic or laboratory services that were ordered for screening or investigation for possible conditions. Symptoms or signs of illness or injury are required prior to payment from Medicare for services rendered. 42 C.F.R. § 411.15(a)(1).

42. For those diagnostic tests that Medicare does cover, such as certain cardiovascular screening tests, such test must be ordered by a "physician who furnishes a consultation or treats a beneficiary for a specific medical problem and <u>who uses the results in the management of the beneficiary's specific medical problem</u>." 42 C.F.R. § 410.32 (emphasis added).

43. Submission of claims to Medicare knowing that the treatment is medically unnecessary constitutes a violation of the FCA.

## CLAIMS FOR REIMBURSEMENT

44. Providers are typically compensated for the services they provide to Medicare beneficiaries on a "fee-for-service" basis as determined by Medicare's fee schedule. 42 U.S.C. § 1395w-4.

8

45. To obtain compensation from Medicare, a provider must submit a claim for services provided on a CMS 1500 form or its electronic equivalent known as the 837P Form.

46. The provider certifies on the CMS 1500 claim that the information provided is "true, accurate and complete;" the services billed on the form were "medically indicated and necessary;" and the provider understands that "payment and satisfaction of this claim will be from federal and state funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal and State laws."

47. Further, healthcare providers are prohibited from knowingly presenting or causing to be presented claims that represent a pattern of items or services that the person knew or should have known were not medically necessary, or knew or should have known were false or fraudulent. 42 U.S.C. § 1320A-7a(a)(1); 1320a-7b(a)(1-3)(i) (Medicare provider who defrauds Medicare is guilty of a felony, punishable by fines and imprisonment).

48. The CMS 1500 form must include the services provided using Current Procedural Terminology Codes ("CPT") and/or Healthcare Common Procedure Coding System Level II Codes ("HCPCS") to indicate to CMS the specific services rendered for which the provider is seeking reimbursement. CPT codes are documented and maintained by the American Medical Association.

49. In addition to a CPT or HCPCS code, providers are also required to include a diagnosis code, or ICD-10-CM, with each claim, which describes the diagnosis or medical condition associated with a particular provider claim to Medicare. *See* 42 C.F.R. § 424.32.

50. ICD-10-CM is used for diagnoses on inpatient discharges and for other services provided on or after the implementation of ICD-10-CM [effective October 1, 2015]. Medicare

9

Case 3:18-cv-00154-HSM-DCP Document 26 Filed 08/29/19 Page 9 of 19 PageID #: 187

Program Integrity Manual (Pub. 100-08), Chapter 3.6.2.4 Coding Determinations. CMS documents and maintains current diagnosis or ICD-10 codes.

51. For instance, a G60.9 diagnosis code indicates that the patient is suffering from idiopathic hereditary neuropathy ("IHN"), a rare autonomic nervous system condition. IHN is nerve damage that interferes with the functioning of the peripheral nervous system, nerves which connect the brain and spinal cord to the rest of the body, for which a cause cannot be determined.

52. Generally, once a provider submits CMS Form 1500 or 837P Form to Medicare, the claim is paid directly to the provider without any review of supporting documentation, including medical records.

## ALLEGATIONS

53. Between 2016 and 2018, Defendant submitted claims for medically unnecessary and non-covered VSAT screening tests to Medicare and Medicaid in order to obtain reimbursements for these services.

54. Given that these claims were medically unnecessary and non-covered tests, they were false under the FCA.

55. The medically unnecessary and non-covered claims were submitted using the following four CPT codes: 93040, 93923, 95923, and 95924.

56. According to the CPT manual, CPT code 93040 is used to bill for an electrocardiographic recording "appropriate when an order for the test is triggered by an event." The rhythm strip produced by this test is used to diagnose either the presence or absence of an arrhythmia, a condition in which the heart beats with an irregular rhythm

10

57. CPT code 93923 is used for claims submitted for bilateral upper or lower extremity arterial studies. The CPT manual states that this noninvasive test is used to measure extremity blood flow in relation to a blockage and sudomotor functioning or sweating.

58. CPT code 95923 is for sudomotor testing. Sudomotor testing includes one or more of the following quantitative sudomotor axon reflex test ("QSART"), silastic sweat imprint, thermoregulatory sweat test, and changes in sympathetic skin potential.

59. CPT code 95924 is used for combined parasympathetic and sympathetic adrenergic function testing with at least five minutes of passive tilt.

60. According to the CPT Manual, the need for each of these types of tests must be supported by documentation in the file, with a specific order for the test, followed by a separate, signed, written, and retrievable report.

61. The VSAT tests performed by Defendant were not warranted on the basis of information in patient records; were duplicative of less costly alternatives; were ordered on the basis of diagnoses that were inconsistently documented in and unjustified in patient records; and significantly, were not used to benefit patients as evidenced by the fact that the VSAT results did not alter the course of treatment provided to Defendant patients.

62. A majority of Defendant's VSAT tests that were paid for by Medicare were submitted with a diagnosis code for the rare neurological disorder, IHN (G60.9).

63. Upon information and belief, before 2016 when Defendant began billing for VSATs, Defendant never submitted a claim to Medicare with a G60.9 diagnosis code.

64. In 2016 and 2017, Defendant submitted over three-thousand (3,000) claims to Medicare that included a G60.9 diagnosis code. Each claim that included a G60.9 diagnosis was for the performance of a VSAT.

11

65. In 2018, though Defendant continued to submit claims for VSAT testing, Defendant submitted only five (5) claims to Medicare that included a G60.9 diagnosis code.

66. Defendant falsified patients' diagnoses to reflect a diagnosis of IHN, when in fact the patients' did not have IHN, in an attempt to justify the VSAT testing it performed.

67. As part of its attempt to justify an IHN diagnosis, Defendant utilized a "Pre-evaluation Questionnaire" (the "Questionnaire") completed by patients and designed to falsely support diagnoses intended to justify VSAT testing.

68. Defendant also employed a "Pre-Evaluation Answer Key" (the "Coding Key") which corresponded with the format of the Questionnaire and the questions contained therein.

69. The Questionnaire included questions for patients such as "Do you ever have pain in your arm(s) and/or leg(s)?"

70. If a patient answered "yes" to that question, for example, the Coding Key dictated that Defendant's coders should submit the VSAT claim with a G60.9 patient diagnosis (IHN).

71. Defendant's patient medical records, including progress notes, do not support a diagnosis of IHN, and the diagnoses noted by the providers in patient charts do not match the diagnoses listed in the claims submitted for reimbursement. Additionally, Defendant providers rarely, if ever, talked with patients about IHN, signifying that Defendant providers were not using the VSAT results for treatment or diagnosis of patients.

72. The statements were false under the FCA as Defendant was not treating Medicare beneficiaries for IHN as the ICD-10 Codes indicated.

73. Defendant knowingly utilized the false diagnosis code in an effort to increase the likelihood that Medicare would pay the VSAT claims.

74. In other instances, Defendant filed claims for VSATs and purportedly used the VSAT to screen patients for risk of cardiovascular disease ("CVD"), specifically, heart attack or stroke.

75. Such CVD screening tests were not medically necessary because they were duplicative of less costly-alternatives.

76. Likewise, upon information and belief, Defendant rarely if ever reviewed the CVD findings of the VSAT with any of its patients.

77. Upon information and belief, Defendant never changed any Medicare beneficiaries' treatment plans based on the VSAT test results, and accordingly Defendant's providers did not use the results of the VSAT test in the management of the beneficiary's specific medical problem. 42 C.F.R. § 410.32.

78. Defendant providers also purportedly ordered VSAT testing to quantify pain.

79. Neither the VSAT nor any other medical device is accepted in the medical community as capable of measuring pain. The standard method of assessing pain is to ask a patient how severe their pain is on a scale of one to ten. Any VSAT testing for the purpose of measuring pain is experimental and investigational, and it is therefore not reimbursable by Medicare.

80. Upon information and belief, Defendant had one of its staff technicians perform the VSAT testing without any knowledge or training on how to use the VSAT equipment.

81. Upon information and belief, for at least the first ten (10) months that Defendant performed VSAT testing, from January 2017 to November 2017, the test results were illegible and blatantly incorrect due to malfunctioning equipment and untrained operators.

82. In sum, Defendant acted with actual knowledge, deliberate ignorance or reckless disregard of the laws, regulations, and guidance applicable to the federal healthcare programs when submitting claims for screening tests performed with a VSAT, procedures and services that Defendant knew were not medically reasonable or necessary.

83. The VSAT testing that Defendant performed on Medicare beneficiaries was not medically necessary and performed only for financial gain.

## SPECIFIC PATIENT EXAMPLES

### Patient 1

84. On January 26, 2017, Patient 1 was seen by Defendant's medical provider for a primary complaint of low back pain. Defendant conducted a VSAT test that day and noted the following in the progress notes:

> VSAT: CVD Risk Assessment, HRV, Pulsewave Velocity, Sudomotor
> Instruction: VSAT ordered in chronic pain patient to assess a quantitative measure of the body's experience of pain which will be used to determine changes in medication, treatments, and to help determine aberrant drug-seeking behavior.

85. Defendant submitted a claim for payment to Medicare for Patient 1's office visit using ICD-10 code G8929 (other chronic pain), and in the claim for payment for the VSAT under CPT codes 93923, 93040, and 95924, it used ICD-10 code G60.9 fraudulently indicating a diagnosis of IHN.

86. The need for VSAT was not supported by the documentation in Patient 1's file.

87. The VSAT was not medically necessary.

88. The VSAT results were not used to alter or amend treatment for Patient 1.

14

**Patient 2**

89. Also on January 26, 2017, Patient 2 was seen by Defendant's medical provider for a primary complaint of neck pain. Defendant performed a VSAT on Patient 2 despite there was no specific order for the test.

90. The need for VSAT was not supported by the documentation in Patient 2's file.

91. The VSAT was not medically necessary.

92. The results of the VSAT were not discussed with Patient 2. Similarly, there was no discussion of IHN with Patient 2 during his visit.

93. Defendant treated Patient 2 for several months prior to performance of the VSAT, yet at no point prior to the performance of the VSAT did Defendant indicate an IHN diagnosis in its Medicare claims. Rather, prior to performance of the VSAT, Defendant stated in its submission to Medicare that Patient 2 had a diagnosis of "Other chronic pain" or "Other chronic postprocedural pain."

94. Nonetheless, when Defendant submitted a claim to Medicare for payment for the VSAT under CPT codes 93923, 93040, and 95923, it did so using ICD-10 code G60.9 fraudulently indicating a diagnosis of IHN.

**Patient 3**

95. On June 16, 2016, Patient 3 was seen by Defendant's medical provider for a primary complaint of neck pain.

96. A VSAT was ordered that day, and the progress note states,

> HRV, Pulsewave Velocity, Sudomotor
> Instructions: VSAT ordered in chronic pain patient to assess a quantitative measure of the body's experience of pain which will be used to determine changes in medication, treatments, and to help determine aberrant drug-seeking behavior.

15

97. A VSAT was performed on July 15, 2016, and Defendant submitted a claim for payment for the VSAT under CPT codes 93923, 93040, and 95923 while using ICD-10 code G60.9 fraudulently indicating a diagnosis of IHN.

98. Patient 3 was treated by Defendant before and after the date the VSAT was performed, yet the only time that Defendant included a diagnosis of IHN was with the claims for the VSAT. On the claims for office visits on other dates of service, the diagnoses that Defendant submitted were "Fusion of spine, cervical region" and "Other chronic pain."

99. The need for VSAT was not supported by the documentation in Patient 3's file.

100. The VSAT was not medically necessary.

101. Based on the patient records, the results of the VSAT were not discussed with Patient 3. Similarly, there was no discussion of IHN with Patient 3 during his visit.

## **PLAINTIFF'S CAUSES OF ACTION**

### **COUNT I**
(False Claims Act: Presentation of False Claims)
31 U.S.C. § 3729(a)(1)(A)

102. Plaintiff realleges and incorporates by reference all of the foregoing paragraphs of this complaint as if fully set forth.

103. Defendant, knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States, including claims for reimbursement for services rendered unlawfully.

104. By virtue of the false or fraudulent claims made by the Defendant, the United States suffered damages and therefore is entitled to multiple damages under the FCA plus a civil penalty for each violation.

16

## COUNT II
(False Claims Act: False Statements Material to Claim Reimbursement)
31 U.S.C. § 3729(a)(1)(B)

105. Plaintiff realleges and incorporates by reference all of the foregoing paragraphs of this complaint as if fully set forth.

106. As set forth above, Defendant knowingly made, used, or caused to be made or used a false record or statements material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

107. Plaintiff relied on materially false statements or records provided by Defendant in paying Defendant for the false and fraudulent claims.

108. By virtue of the false or fraudulent claims submitted or caused to be submitted by Defendant, the United suffered damages and therefore is entitled to multiple damages under the FCA plus a civil penalty for each violation.

## COUNT III
(Payment under Mistake of Fact)

109. This is a common law claim for the recovery of monies paid by the United States during the relevant time period to Defendant as a result of mistaken understanding of fact. This Court has jurisdiction pursuant to 28 U.S.C. § 1367(a).

110. Plaintiff paid Defendant for claims for services that were not reasonable and necessary for the diagnosis or treatment of individual patients as required by Medicare and Medicaid. Plaintiff made these payments without knowledge of material facts and under the mistaken belief that Defendant was entitled to receive payment for such claims when it was not. Plaintiff's mistaken beliefs were material to its decision to pay Defendant for such claims. Accordingly, Defendant is liable to make restitution to Plaintiff for the amounts of the payments made in error to it by Plaintiff.

## COUNT IV
(Unjust Enrichment)

111. This is a common law claim for unjust enrichment. This Court has jurisdiction pursuant to 28 U.S.C. § 1367(a).

112. Plaintiff reallages and incorporates by reference all of the foregoing paragraphs of this complaint as if fully set forth.

113. By submitting claims for payment for services that were not provided or were not medically necessary, the Defendant received funds belonging to the United States, for which it was not entitled.

## COUNT V
(Conversion)

114. This is a common law claim for conversion. This Court has jurisdiction pursuant to 28 U.S.C. § 1367(a).

115. Plaintiff reallages and incorporates by reference all of the foregoing paragraphs of this complaint as if fully set forth.

116. By submitting claims for payment for services that were not medically necessary, the Defendant obtained and withheld funds belonging to the United States, exercising dominion and control over the property of the United States, commingling the property of the United States with its own and making it impossible to locate the property of the United States.

## REQUEST FOR RELIEF

117. The United States demands and requests that judgment be entered in its favor against Defendant, as follows:

   a. On Counts I-II under the False Claims Act, as amended, for the amount of the United States' damages, trebled as required by law, and such civil penalties as

are required by law, together with all such further relief as may be just and proper.

b. On Counts III-V for the amount of the United States' damages, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

c. All other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), the United States demands a trial by jury of all issues so triable.

Dated:  August 29, 2019

        Respectfully submitted,

        J. DOUGLAS OVERBEY
        United States Attorney

By: s/ Jeremy S. Dykes
    Jeremy S. Dykes, Maryland Bar Member
    L. Margaret Harker, Virginia Bar No. 82188
    Assistant United States Attorneys
    800 Market Street, Suite 211
    Knoxville, Tennessee 37902-2312
    jeremy.dykes@usdoj.gov
    margaret.harker@usdoj.gov
    Telephone: (865) 545-4167